753 A.2d 788

In re FUNDS IN the POSSESSION OF CONEMAUGH
TOWNSHIP SUPERVISORS.

Appeal of Officer William Richards.

In re Funds in the Possession of Conemaugh
Township Supervisors.

Appeal of Michael Shreckengost.

Supreme Court of Pennsylvania.

Argued March 6, 2000.

Decided June 20, 2000.

D.C. Nokes, Jr., Johnstown, for Officer William Richards.

William Gleason Barbin, Johnstown, for Conemaugh Tp.

Kenneth L. Nichols, New Kensington, for Michael Shreckengost.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION OF THE COURT

FLAHERTY, Chief Justice.

This is an appeal from a Commonwealth Court ruling that $20,000 in lost U.S. currency should escheat to the common-

wealth rather than being awarded to the Conemaugh Township police officers who found it on the roadside during a routine traffic stop.

This litigation arises from Officer William Richards' discovery of a package containing the cash while he was investigating a pickup truck stopped alongside a road, but facing in the wrong direction, in Conemaugh Township on February 15, 1996. Officer Richards, when he saw the truck parked facing the wrong direction, pulled his cruiser off the roadway and parked facing the front of the truck. Richards exited his cruiser and confronted appellant Michael Shreckengost, the operator of the pickup, who was standing beside the vehicle. The officer asked Shreckengost for his license and owner's card, then walked to the back of the truck to check its registration. He noticed a black plastic package lying six feet behind the truck and four feet off the roadway. He retrieved it, returned to his cruiser, opened the package, and discovered the cash. Suspecting criminal activity, Richards radioed for support, and Officer John F. McKnight soon arrived. In response to questioning by the officers, Shreckengost repeatedly denied having thrown anything from his truck and disclaimed any knowledge of the package. The officers searched the truck and Shreckengost's person, found no evidence of illegal activity, and permitted him to depart.

The officers immediately surrendered the cash to the chief of the township police department, Ronald Imler. Chief Imler assumed custody of the cash and began extensive efforts to locate the owner. He contacted the national crime information center on a daily basis to learn if any lost, stolen, or missing funds had been reported to any other police departments. Chief Imler reviewed the lost-and-found sections of local newspapers regularly, contacted neighboring municipalities, etc., without result.

Three months later, Conemaugh Township petitioned the court of common pleas for a declaratory judgment awarding the cash to officers Richards and McKnight. A hearing, which had been advertised in local newspapers, was held on September 10, 1996, but no claimant appeared to contest the petition.

Shortly thereafter, Chief Imler chanced to see an article in the *Pittsburgh Post–Gazette* in which appellant Shreckengost reportedly claimed to own the cash in question. When Imler contacted appellant, he claimed he had accidentally thrown the money from his truck and requested that the township mail him a check at a Florida motel.

The court held a second hearing on April 11, 1997. The notes of testimony relate the following tale. Appellant testified that a former brother-in-law gave him the cash on February 15, 1996, the day officer Richards found the money, for the purpose of speculating in Florida real estate. Shreckengost could not describe the denominations of the bills because he had not counted the cash; instead, he rolled it up in a "black paper/plastic bag" and stored it among an accumulation of garbage in his pickup. He explained that he parked beside the road because he had been drinking and needed to relieve himself. He then claimed that, while officer Richards was checking his license and registration, he was sitting in the driver's seat of his pickup with a half-empty beer can he'd been drinking and that he threw it out the window while officer Richards sat in the cruiser facing him. When he threw out the beer can, he also inadvertently threw out the package of cash. He did not miss the cash until the next morning. Although he returned to the scene of the encounter with the police, he could not find the cash, and returned to Florida without reporting his loss to anyone. Seven months later, he was again visiting Pennsylvania. He saw a television news report about the cash found by the police, and again returned to Florida without reporting his claim to anyone. Sometime later, a reporter with the *Pittsburgh Post–Gazette* contacted Shreckengost, who, for the first time, related his account of losing the money.

The trial court gave no credence to Shreckengost's testimony. The court held that officer Richards, as finder, had a valid claim to the lost or abandoned property, and declared him the owner.

Commonwealth Court reversed. It recognized the special position of the trial court in making credibility determinations,

and thus accepted the court's conclusion that Shreckengost had no claim. It also agreed with the trial court that under the common law, the finder of lost property has a valid claim against all but the true owner, who is unknown in this case.

Commonwealth Court parted company with the trial court, however, on the question of whether a police officer who finds lost property in the performance of his official duties should stand in the same shoes as an ordinary citizen who finds lost property. The court held that public policy dictated otherwise: public confidence in the purity in the administration of justice would be undermined if a police officer who, in the course of his official duties, finds lost property were to be rewarded by being permitted to keep the property. Police officers are held to substantially higher standards than ordinary citizens. It is part of an officer's duty to assure the protection of lost property and to investigate whether the lost property is evidence of crime and whether the true owner can be located. The implication is that if the law permitted an officer to retain lost property when investigation reveals no evidence of a crime and the owner cannot be found, then the police might be encouraged by such a policy to conduct sham or less than complete investigations in order to insure that no crimes would be unearthed and that true owners would never be located. *In re Funds in Conemaugh Township*, 724 A.2d 990, 994–95 (Pa.Cmwlth.1999).

The issues are whether Commonwealth Court was correct in denying the claim of Shreckengost and, if so, in requiring the funds to be disposed of in accordance with the Escheat Act rather than awarding the funds to Officer Richards.

■ Commonwealth Court was correct in considering itself bound by the credibility determinations of the trial court. The finder of fact is sole judge of credibility and is free to believe all, part, or none of the evidence. This is true of a judge in a bench trial, as well as a jury. *Rizzo v. Haines*, 520 Pa. 484, 491–92, 555 A.2d 58, 61 (1989); *Hodges v. Rodriguez*, 435 Pa.Super. 360, 366, 645 A.2d 1340, 1343 (1994). Thus we, as well as Commonwealth Court, accept the trial court's incredul-

ity at the testimony of Shreckengost, and therefore agree that no valid claim was made by the true owner of the $20,000.

■ The trial court and Commonwealth Court were also correct in holding that the common law gives the finder of lost or abandoned property a claim superior to that of anyone except the true owner. It has long been the law that "the finder of lost property has a valid claim to the same against all the world, except the true owner," *Hamaker v. Blanchard*, 90 Pa. 377, 379 (1879), and that "the finder of money has title to it against all the world except the true owner." *Warren v. Ulrich*, 130 Pa. 413, 414, 18 A. 618 (1889).

■ Commonwealth Court did not apply the common law rule to vest title in Officer Richards, but held that public policy dictated an exception in the case of a police officer who finds lost property while performing official duties which include the protection of such property. While we reject any implication that public policy requires the judicial creation of a deterrent to prevent police officers from fraudulent or criminal behavior with respect to property they find while performing their duties, we reach the same result. A police officer on duty does not stand in the same shoes as an ordinary citizen when he finds lost property.

With regard to lost property, the California Court of Appeals has ably summarized the position of trust enjoyed by police officers:

When a police officer discovers personal property of value abandoned upon the streets of a city, it is but natural and reasonable to assume that either of two things has occurred, namely, that the property has been stolen or has been lost.... In either case, ... it is well within the duty of a police officer to make inquiry, and, pending the result of that inquiry, to assure the safety and protection of the property, which is otherwise liable to destruction or deterioration. This duty and right of the police is universally conceded to the extent that the average citizen accepts it as a matter of course, and upon the discovery of property apparently lost the first thing that suggests itself is to notify the police.... Each individual forthwith concedes and

recognizes the law and the right of the officer; and this right and power inures to the policeman solely and entirely by virtue of his office and not otherwise.

*Noble v. City of Palo Alto,* 89 Cal.App. 47, 264 P. 529, 532 (1928).

■ As the *Noble* opinion states, the role of the policeman exists "solely and entirely by virtue of his office and not otherwise." This is critical to the disposition of the lost $20,000 and to evaluating Richard's claim thereto. While on duty, the officer is the agent of the state for safeguarding lost property and returning it to its rightful owner. If a citizen approached him on the street and said, "Sir, I just found this lost property," the officer obviously would have no claim to the property as finder. The same is true of an officer who personally finds lost property while on duty. It is part of his duty to secure such property and to return it to its owner. Therefore, if his duties place him in a position to find such property, he finds it as agent of the state, not in his personal capacity.

■ The Escheat Act provides that certain categories of property must be reported to the state treasurer, including:

5. All property held by or subject to the control of any court, public corporation, public authority or instrumentality of the Commonwealth or by a public officer or political subdivision thereof, which is without a rightful or lawful owner, to the extent not otherwise provided for by law, held for more than one year.

72 P.S. § 1301.9(5). The funds at issue in this case are subject to this section of the statute, as Commonwealth Court held. The former or "true" owner remains unknown, and the police officers cannot claim the money as finders, so the money in question "is without a rightful or lawful owner." Commonwealth Court was therefore correct in ordering the township to report the money to the state treasurer as abandoned or unclaimed property under the Escheat Act.

Order affirmed.

Justice CAPPY files a dissenting opinion.

CAPPY, Justice, dissenting.

I agree with the majority when it states that "[a] police officer on duty does not stand in the same shoes as an ordinary citizen when he finds lost property." (Majority opinion at p. 791). However, I cannot agree with the ultimate conclusion of the majority, that a police officer by virtue of his official capacity cannot lay claim to lost property found while on official duty just as any other ordinary citizen would. Therefore I am compelled to dissent.

A finder of lost property has a valid claim to it as against all the world, except the true owner. *Hamaker v. Blanchard*, 90 Pa. 377, 379 (1879). The majority in the name of public policy creates a special category for police officers as distinct from all other citizens of this Commonwealth in regard to lost property. I recognize that the majority in reaching its conclusion rejected the argument that public policy requires police officers to be exempt from the common law rule as to lost property as a deterrent to prevent police officers from acting fraudulently in regard to lost property they encounter during the scope of their official duties. I disagree that a police officer should be in need of a deterrent. On this point I wholeheartedly agree with the majority. Furthermore, I am compelled to point out that an argument could also be made that exempting police officers from the right to claim title to lost property because of their official status could have the same negative effect that the proponents of the exemption seek to eliminate.

The majority, rather than focusing on a policy argument as to encouraging or discouraging honesty among police officers, reaches its conclusion by looking at the nature of the police officer's job as it impacts on lost and found items. The majority reasons that a police officer is more likely to come across lost property than other citizens because of his or her status as a police officer. The job itself causes police to be in locales where lost items accumulate. Also, by virtue of the officers' official capacity, citizens are encouraged to approach police officers and turn over lost property so that the officer may utilize the tools at his or her disposal to discover the true

owner. Thus, the majority reasons, the police officer is a conduit, receiving lost property only for the purpose of enabling the return of said property to the true owner. As it is this official status which places the officer in a position to find the property, it is necessary to treat the officer differently from all others as a "finder" of lost property. Whereupon the majority decrees that police officers are forever barred from being a "finder" of lost property entitled to claim it as their own when all efforts to discover the true owner have failed. This analysis is flawed.

First, there is no basis for the majority's statement that police officers by virtue of their position are more often a "finder" of lost property than other citizens. There is nothing in this record, or within the realm of common knowledge and understanding that supports the propositions that police officers find more lost property than persons in any other job classification do. I would posit that bus drivers, hotel maids and airplane attendants would find more lost items on any given day than a police officer. Second, when another citizen hands a police officer lost property so that the police officer can use his official capacity to discover the true owner, it is the initial citizen who is the finder, not the police officer. In those circumstances the officer has no right to claim title to the lost property, as he is not the finder, the citizen who turned it over to the police officer is the finder. In my view, the majority offers no justification for this disparate treatment as to police officers.

When a police officer is the actual person who found the lost item, and he fulfills his official duty in using all resources at his disposal to locate the true owner, albeit unsuccessfully, that officer should be awarded title to the lost item. Officer Richards found the money in his official capacity. The property was not turned over to the officer by a third person. Officer Richards in his official capacity made every effort to discover the true owner. It was only after all efforts were unavailing that the officer made a claim to receive the money as the finder of lost property. This officer took every action the majority could want an officer to undertake when he is

faced with the discovery of lost property in his official capacity. However, the majority chooses to penalize the officer because he was in his official capacity when he found the property. I cannot endorse that decision. Accordingly, I respectfully dissent.